IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
February 14, 2018 Session

**STATE OF TENNESSEE v. JAMES KEVIN WOODS**

**Appeal from the Criminal Court for Wilson County**
**No. 15-CR-17     John D. Wootten, Jr., Judge**

_____

**No. M2017-00800-CCA-R3-CD**

_____

James Kevin Woods, the Defendant, was convicted by a Wilson County jury of three counts of sale of 0.5 grams or more of cocaine and received a total effective sentence of forty years as a Range II multiple offender.  On direct appeal, he argues that (1) the evidence was insufficient for a rational juror to have found him guilty of sale of cocaine beyond a reasonable doubt; (2) the trial court improperly limited the Defendant's cross-examination of State witnesses; (3) the professional criminal and extensive criminal history factors in Tennessee Code Annotated section 40-35-115(b) are unconstitutionally vague; and (4) the trial court abused its discretion by ordering a partially consecutive sentence.  After a thorough review of the facts and applicable case law, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT W. WEDEMEYER, J., joined.

Charles D. Buckholts, Nashville, Tennessee, for the appellant, James Kevin Woods.

Herbert H. Slatery III, Attorney General and Reporter; Leslie E. Price, Senior Counsel; Tom P. Thompson, Jr., District Attorney General; and Jason Lawson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I. Factual and Procedural History

The Wilson County Grand Jury indicted the Defendant for sale of 0.5 grams or more of cocaine, a Schedule II controlled substance, in counts one, two, and three and sale of less than 0.5 grams of cocaine, a Schedule II controlled substance, in count four.[1]

### Jury Trial

At trial, Detective Allen McPeak testified that he was currently the supervisor of the narcotics unit at the Wilson County Sheriff's Office ("WCSO"). Detective McPeak explained that a confidential informant ("CI") performed forty-one controlled buys for the WCSO. In exchange for his assistance, the WCSO paid the CI for his involvement in the controlled buys, and the State agreed to not charge the CI for selling cocaine to a different CI during a controlled buy in August 2013. Detective McPeak testified that he frequently worked as the CI's case agent. On January 29, 2014, the CI contacted Detective McPeak and asked to meet with him to discuss a controlled buy. Detective McPeak met at a secure location and searched the CI; other detectives searched the CI's vehicle. The detectives did not find any illegal substances on the CI or in his vehicle. The CI identified the Defendant as the targeted seller in the controlled buy. Detective McPeak issued $160 in money with recorded serial numbers to the CI to use during the controlled buy. Detective McPeak discussed the operational plan with the CI, who was going to attempt to purchase two grams of cocaine from the Defendant. Detective McPeak also issued an audio and a video recording device to the CI. Detective McPeak explained that the audio recording device transmitted a live feed to the detectives' vehicles during the controlled buy. Detective McPeak assigned other detectives to observe the CI during the controlled buy.

Detective McPeak stated that the CI drove himself to the pre-arranged location of the controlled buy at Lebanon Chemical. The other detectives followed the CI from a short distance. However, the CI changed the location of the controlled buy to a nearby parking lot because a police cruiser was parked where the controlled buy was supposed to occur. Detective McPeak observed the CI arrive and depart from the location of the controlled buy. The CI then met with Detective McPeak at the secure location, and the CI gave Detective McPeak the controlled substance that he purchased from the Defendant and reported the details of the controlled buy to Detective McPeak. Detective McPeak again searched the CI, and the other detectives again searched the CI's vehicle. The other

---

[1] It appears that count four was dismissed prior to the start of the jury trial. However, the record on appeal does not include an order amending the indictment or dismissing the charge.

detectives gave Detective McPeak information about the vehicle driven by the seller in the controlled buy; when Detective McPeak researched the license tag number, he learned that the Defendant owned the vehicle. Detective McPeak paid the CI $100 for his assistance in the January 29, 2014, controlled buy.

Detective McPeak was also the CI's case agent for a controlled buy on February 26, 2014. The CI informed Detective McPeak that he had arranged to purchase a controlled substance from the Defendant. Detective McPeak again met with the CI at a secure location, along with Chief Deputy Mike Owen and Detective Jeremy Reich. At the secure location, Detective McPeak searched the CI while Chief Deputy Owen and Detective Reich searched the CI's vehicle; the detectives did not find any illegal objects or substances. Detective McPeak issued $80 in marked bills and audio and video recording devices to the CI to use in the controlled buy. The CI informed Detective McPeak that the controlled buy was scheduled to occur on Cleveland Avenue. Detective McPeak observed the CI travel to and depart from the arranged location of the controlled buy. After the controlled buy, Detective McPeak met with the CI at the secure location, and the CI gave the detectives the controlled substance that he purchased from the Defendant. Detective McPeak then searched the CI, and Chief Deputy Owen and Detective Reich searched the CI's vehicle. Detective McPeak also retrieved the audio and video recording devices from the CI.

On cross-examination, Detective McPeak testified that he did not physically observe the controlled buys on January 29 and February 26, 2014. He explained that he listened to the live audio feed of the controlled buys and later watched the video recording of the controlled buys. Detective McPeak agreed that the case number on the undercover operations report was different from the case number on the "Indictment Information and Discovery."[2] Detective McPeak agreed that the report and the discovery contained other minor inconsistencies.

Sergeant Lane Mullins testified that, in 2014, he was a narcotics division sergeant with the WCSO. He stated that he assisted Detective McPeak with the controlled buy on January 29, 2014; he was "assigned to search the vehicle then conduct surveillance to and from and during, so from the secure location to the deal site, during the deal at the deal site, and then from the deal site back to the secure location." After he searched the CI's vehicle, he drove to the general area of the controlled buy and observed a white Explorer in the parking lot next to the agreed meeting spot. He explained that either he or Detective Reich noted the license tag number of the white Explorer. Sergeant Mullins

---

[2] The "Indictment Information and Discovery" document is included in our record on appeal. It appears that the State submitted the document to the Defendant as a part of the discovery process.

observed the CI meet with an individual and then Sergeant Mullins followed the CI back to the secure location. He then searched the CI's vehicle again.

On February 5, 2014, Sergeant Mullins served as the case agent for a second controlled buy that involved the CI; Chief Deputy Owen and Detective Reich assisted with this controlled buy. Sergeant Mullins and Detective Reich met with the CI at the secure location to discuss the controlled buy while Chief Deputy Owen proceeded to the location of the controlled buy to set up surveillance. Sergeant Mullins planned for the CI to meet the Defendant on Hill Street to purchase one gram of crack cocaine. Sergeant Mullins searched the CI and provided him with audio and visual recording devices and $70 in marked bills, and Detective Reich searched the CI's vehicle. Sergeant Mullins, Detective Reich, and the CI left the secure location. The CI parked behind a residence while Sergeant Mullins parked across the street. However, an individual came out of the residence and told the CI that he could not stay there. The CI called the Defendant and informed Sergeant Mullins that the location of the controlled buy had been moved. Sergeant Mullins, Detective Reich, and Chief Deputy Owen proceeded to set up surveillance at the new location. Sergeant Mullins observed the CI arrive at the new location and heard the CI have a conversation with two individuals over the live audio wire. Sergeant Mullins then observed the CI pull out of the location, followed by a white Explorer. Sergeant Mullins and the CI returned to the secure location where Sergeant Mullins searched the CI and Detective Reich searched his vehicle. The CI gave the crack cocaine that he purchased and the recording devices to Sergeant Mullins, and they reviewed the details of the controlled buy. Sergeant Mullins then paid the CI for his involvement in the controlled buy.

On cross-examination, Sergeant Mullins testified that, on January 29, 2014, there were moments during the controlled buy when he lost sight of the CI. Sergeant Mullins agreed that there were inconsistencies between the "Indictment Information and Discovery" sheet and the undercover operations report. On redirect-examination, Sergeant Mullins explained that, although he may have lost sight of the CI at times during the January 29 controlled buy, another detective always had sight of the CI during the controlled buy.

Detective Jeremy Reich testified that he had worked in the narcotics division of the WCSO for approximately nine years. On January 29, 2014, Detective Reich assisted with a controlled buy. He searched the CI's vehicle prior to the buy at the secure location. Detective Reich followed the CI to the location of the buy at Lebanon Chemical and set up surveillance. He stated that, as he "was pulling through, [he] passed a white Ford Explorer on [his] way to where [he] was go[ing] sit and watch." The driver of the white Explorer "appeared to match the description of the black male that [he] had seen a photo of -- which was [the Defendant] -- prior to the transaction taking place at the secure

location." The white Explorer parked next to the CI's vehicle at the arranged location. After the controlled buy occurred, Detective Reich followed the CI back to the secure location, where he searched the vehicle again. On February 5, 2014, Detective Reich assisted with the second controlled buy that involved the Defendant. He searched the CI's vehicle at the secure location and proceeded to the location of the buy on Hill Street. He drove past the location and saw the CI turn into a driveway. Detective Reich later drove to another location on Market Street and listened to the live audio feed of the controlled buy. Detective Reich then returned to the secure location and searched the CI's vehicle. On February 26, 2014, Detective Reich assisted with the third controlled buy that involved the Defendant by searching the CI's vehicle at the secure location. He observed the controlled buy through the live audio feed and then searched the CI's vehicle again after the controlled buy.

Chief Deputy Mike Owen testified that, prior to his current position, he worked as an agent and later as the supervisor of the narcotics unit of the WCSO. Chief Deputy Owen assisted with controlled buys that involved the Defendant on February 5 and February 26, 2014. On February 5, he assisted with preparing the CI for the controlled buy at the secure location. He then proceeded to Hill Street to set up surveillance in a nearby parking lot. Just before he heard the CI arrive at the designated location of the controlled buy, he "noticed a vehicle that appeared to be the same vehicle that the detectives had done a controlled buy operation on[.]" Chief Deputy Owen recognized the vehicle, a white Explorer, based on a photograph of the Defendant's vehicle and license tag. He observed the Defendant's vehicle make several passes by the CI's location. Later, the CI informed Chief Deputy Owen over the live audio feed that the location of the controlled buy had moved to the Market Street area. As Chief Deputy Owen drove to the new location, he observed the Defendant's vehicle driving in the area. After the CI completed the controlled buy, Chief Deputy Owen ensured that the CI was not followed to the secure location. At the secure location, Chief Deputy Owen searched the passenger side of the CI's vehicle.

On February 26, 2014, Chief Deputy Owen assisted in the controlled buy by searching the CI's vehicle at the secure location. He then traveled to Cleveland Street, the arranged location of the controlled buy, to set up surveillance. After the CI completed the controlled buy, Chief Deputy Owen again ensured that the CI was not followed back to the secure location. When he returned to the secure location, Chief Deputy Owen conducted a second search of the CI's vehicle.

On cross-examination, Chief Deputy Owen testified that he and other detectives researched the CI's criminal history before agreeing to use him as a CI. He stated that his researched showed that the CI did not have a valid driver's license at the time the CI worked for the WCSO.

- 5 -

Special Agent Glen Jay Glenn testified that he had worked as a forensic scientist at the Tennessee Bureau of Investigation crime laboratory for approximately twenty-two years. After the trial court declared Special Agent Glenn to be an expert in the field of controlled substance identification, Special Agent Glenn stated that he conducted three different tests on the cocaine obtained during the controlled buy on February 26, 2014, and determined that it was 0.91 grams of cocaine base. He also stated that a second forensic analyst tested the cocaine obtained during the controlled buy on February 5, 2014, using the same tests and protocols that he used and determined that the substance was 0.85 grams of cocaine base. Additionally, Special Agent Glenn testified that another forensic analyst tested the substance obtained during the controlled buy on January 29, 2014, using the same tests and protocols that he used and determined that the substance was 1.95 grams of cocaine base.

The CI testified that he was currently incarcerated for a probation violation. He stated that he knew the Defendant because he "[d]id a buy with him" by "[g]oing and purchasing crack cocaine and powder cocaine from [the Defendant]." The CI explained that he was working as a CI for the WCSO in 2014. He testified that he received $100 for each controlled buy. On January 29, 2014, the CI called the Defendant and asked him if he had any "work," or cocaine. The Defendant informed the CI that he was "straight," meaning he had powder cocaine, so the CI coordinated with the WCSO to set up a controlled buy. The CI met with Detectives Mullins and McPeak, who searched his person and vehicle. The detectives gave the CI $160 to purchase two grams of powder cocaine in the controlled buy, as well as a recording device. He then drove to Lebanon Chemical and met the Defendant, who was driving a white Explorer. An individual known as "Pancho" got out of the Defendant's vehicle and gave the CI two grams of powder cocaine. The CI then returned to the secure location and gave the powder cocaine and recording device to the detectives. The detectives searched the CI and gave him $100 for his participation in the controlled buy.

On February 5, 2014, the CI participated in a second controlled buy from the Defendant. The CI called the Defendant and asked to purchase a gram of crack cocaine. He then met with the WCSO detectives, who searched him and gave him a recording device and money to make the purchase. The CI stated that he originally planned to meet the Defendant on Hill Street, but the Defendant moved the location to a location behind Market Street School. When he arrived at the location, he left his vehicle and got into the back seat of the Defendant's vehicle. The CI gave $70 to the Defendant, and the Defendant gave him crack cocaine. After he completed the transaction, the CI returned to his car and drove to the secure location. The WCSO searched his person and vehicle and paid the CI $100, and the CI returned the recording device and cocaine.

On February 26, the CI called the Defendant and asked to purchase cocaine. He met with the WCSO detectives at a secure location, where they searched him and his car and gave him a recording device and buy money. The CI planned to meet the Defendant at a location on Cleveland Avenue. As he was driving to the location, the Defendant called him asking why he was not at the location; the CI told the Defendant that he could not speed because he did not have a valid driver's license. When the CI arrived at the location, he got into the Defendant's vehicle and purchased a gram of cocaine for $80. After the purchase, the CI returned to the secure location; the detectives retrieved the recording device and cocaine and searched the CI and his vehicle. The detectives paid the CI for his assistance with the controlled buy. The CI testified that, prior to trial, he went to defense counsel's office to discuss the Defendant's case. He admitted that he told defense counsel that he had never purchased a controlled substance from the Defendant, which was not a truthful statement. The CI agreed that he had previously been convicted of several misdemeanor offenses, including criminal impersonation and theft.

On cross-examination, the CI testified that, in exchange for not being charged with sale of cocaine, he agreed to perform nine controlled buys for the WCSO. He agreed that, in January and February 2014, he did not have a valid driver's license.

The Defendant elected to not testify. The jury found the Defendant guilty of sale of 0.5 grams or more of cocaine in counts one, two, and three.

*Sentencing Hearing*

Julie Raines testified that she worked in the Tennessee Department of Correction and conducted the presentencing investigation on the Defendant. She stated that the Defendant had previously been convicted of the following convictions:

| Case Number | Offense | Sentence | Judgment Date | Offense Classification |
|---|---|---|---|---|
| 3:07-00241-01 | Distribution/possession with intent to distribute cocaine | Sixty months | 01/08/2009 | Federal conviction |
| 02-0933 | Sale of less than 0.5 grams of cocaine | Five years confinement | 01/29/2004 | Class C felony |
| 02-1206 | Sale of less than 0.5 grams of cocaine | Six years confinement | 01/29/2004 | Class C felony |
| 2001-CR-7834 | Simple possession of cocaine | | 12/04/2001 | Class A misd. |

| | | | | |
|---|---|---|---|---|
| 2001-CR-7835 | Resisting arrest | | 12/04/2001 | Class B misd. |
| 2001-CR-7836 | Evading arrest | | 12/04/2001 | Class A misd. |
| 2001-CR-7837 | Simple possession of cocaine | | 12/04/2001 | Class A misd. |
| 01-1535 | Sale of less than 0.5 grams of cocaine | Three years of community corrections | 11/21/2001 | Class C felony |
| 99-1556 | Attempted possession of cocaine | One year confinement | 11/21/2001 | Class E felony |
| 2000-CR-10452 | Criminal Trespass | | 12/12/2000 | Class C misd. |
| 2000-CR-10438 | Reckless Endangerment (no weapon involved) | | 12/12/2000 | Class A misd. |

Ms. Raines also stated that the Defendant had a charge involving cocaine, a Schedule II drug, pending in Wilson County Criminal Court in case number 2013-CR-804. Ms. Raines testified that the Defendant was adjudicated delinquent on a charge of rape in juvenile court in 1999. Additionally, Ms. Raines testified that the Defendant received an alternative sentence for several convictions, but he violated the conditions of those alternative sentences. On August 2, 2001, the Defendant's probation in case number 99-1556 was revoked, and the Defendant was sentenced to serve one year on community corrections. On November 21, 2001, the Defendant's community corrections sentence in case number 99-1556 was revoked, and the Defendant was incarcerated. On September 16, 2003, the Defendant's community corrections sentence in case number 01-1535 was fully revoked, and the Defendant was incarcerated. On November 4, 2005, the Defendant was temporarily incarcerated in case numbers 02-0933 and 02-1206 because "he failed drug screen [and] tested positive for cocaine and marijuana" and because "he left residential treatment without permission." On January 31, 2006, the Defendant's probation was fully revoked, and he was incarcerated in case numbers 02-0933 and 02-1206. The Defendant's supervised release in his federal case was revoked on May 15, 2014.

Ms. Raines testified that the Defendant, who was thirty-five at the time of the sentencing hearing, had completed the tenth grade. She explained that the Defendant reported that he was self-employed in the concrete industry; however, she could not verify this employment. She noted that a previous parole or probation officer had reported that the Defendant has been employed by Sportswear Promotions from May 2, 2005, until June 18, 2005. The Defendant reported that he had no assets and no debts. Ms. Raines recommended that, if the trial court ordered an alternative sentence, "the [D]efendant submit to random drug screens and home visits at the probation officer's discretion, . . . the [Defendant] undergo an alcohol and drug assessment and complete any recommended treatment, as well as pro-social life skills classes and a GED class." On cross-examination, Ms. Raines agreed that the Defendant successfully completed his probation for his delinquency adjudication for rape and that the Defendant was discharged from probation in that case. She also agreed that the Defendant's probation had been previously revoked, in part, for failing drug screens. Ms. Raines agreed that the Defendant reported smoking marijuana daily since he was thirteen years old. The Defendant also reported using lortabs, "roxys[,]" and Percocet, and that his health was poor due to withdrawal from opiates. Ms. Raines testified that the Defendant completed a treatment facility program in 2013.

The trial court considered "the sentencing act that is in effect in this state, . . . the general principles of sentencing, and the sentencing considerations contained in the statute." The trial court noted that the State conceded that the Defendant was a Range II multiple offender. The trial court found that the Defendant had a previous history of criminal behavior in addition to the convictions that established the range. The trial court also found that the Defendant was a leader in the commission of a crime and that he had failed to comply with the terms of probation in the past. The trial court found no mitigating circumstances. The trial court sentenced the Defendant to twenty years each for counts one, two, and three.

Regarding sentence alignment, the trial court found that the Defendant was a professional criminal who had "knowingly devoted [his] life to criminal acts as a major source for livelihood." The trial court noted that the Defendant reported having no assets and no debts. The trial court also found that the Defendant's "record of criminal activity [was] extensive." Lastly, the trial court found that the Defendant committed the current offenses while on probation. Thus, the trial court ordered the Defendant's sentences for counts one and two to run concurrently with each other and the sentence for count three to run consecutively to the sentences for counts one and two for a total effective sentence of forty years.

## II. Analysis

*Sufficiency of the evidence*

The Defendant argues that the evidence introduced at trial was insufficient for a rational juror to have found him guilty of three counts of sale of 0.5 grams or more of cocaine beyond a reasonable doubt. He asserts that "the evidence in this case was unreliable" because the WCSO detectives "mixed up case numbers and dollar amounts of the transactions in their reports." The State contends that the evidence at trial was "more than sufficient" to establish the Defendant's guilt beyond a reasonable doubt and asserts that "the jury's verdict of guilty on all three counts resolved those inconsistences in favor of the State."

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

"It is an offense for a defendant to knowingly[] . . . [s]ell a controlled substance[.]" Tenn. Code Ann. § 39-17-417(a)(3) (2014). Cocaine is a Schedule II controlled substance. Tenn. Code Ann. § 39-17-408(b)(4) (2014). Selling a controlled substance "is a Class B felony if the amount involved is point five (0.5) grams or more of any substance containing cocaine or methamphetamine[.]" Tenn. Code Ann. § 39-17-417(c)(1) (2014).

Relative to count one, "[a] person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of

- 10 -

another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a) (2014). As pertinent here, a person is criminally responsible for the conduct of another when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2) (2014). Criminal responsibility is not a separate crime but instead a theory by which the State may prove the defendant's guilt based upon another person's conduct. *State v. Osborne*, 251 S.W.3d 1, 16 (Tenn. Crim. App. 2007) (citing *State v. Mickens*, 123 S.W.3d 355, 389-90 (Tenn. Crim. App. 2003)).

"[U]nder the theory of criminal responsibility, presence and companionship with the perpetrator of a felony before and after the commission of the crime are circumstances from which an individual's participation may be inferred." *State v. Phillips*, 76 S.W.3d 1, 9 (Tenn. Crim. App. 2001). In order to be convicted of the crime, the evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission. *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994); *State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988).

The Defendant points out that there was "inconsistent testimony from the officers as to who searched the confidential informant and who searched his vehicle and their own protocol was not followed during some of these searches" and about "how many drug transactions the confidential informant had completed for Wilson County law enforcement." The Defendant also notes that the CI admitted at trial that his statement to defense counsel that he did not purchase cocaine from the Defendant was not a true statement. However, as our supreme court stated in *Bland*, "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." 958 S.W.2d at 659. Thus, by finding the Defendant guilty, the jury implicitly resolved any conflicts between the testimonies of the detectives and between the undercover operations report and the Indictment Information and Discovery.

Here, the detectives from the WCSO testified that, on three occasions, they met with the CI at a secure location and searched the CI's person and vehicle. The detectives and the CI then proceeded to the arranged location of the controlled buy, where the detectives set up surveillance and the CI met with the Defendant. The CI testified that, on January 29, 2014, "Pancho" handed the cocaine to him while the Defendant was driving. On February 5 and February 26, 2014, the Defendant gave cocaine to the CI in exchange for money. After the controlled buys were completed, the CI and the detectives returned to the secure location where the detectives searched the CI's person and vehicle for contraband. All three controlled buys were recorded. Special Agent Glenn testified

that he tested the substance purchased on February 26, 2014, and that the substance was 0.91 grams of cocaine base. He also testified that other forensic analysts tested the substance purchased on February 5 and determined that it was 0.85 grams of cocaine base and that the substance purchased on January 29 was 1.95 grams of cocaine base. When the evidence is viewed in the light most favorable to the State, we conclude that the evidence was sufficient for a rational juror to have found the Defendant guilty of sale of 0.5 grams or more of cocaine in counts one, two, and three.

*Limitation of cross-examination of State witnesses*

The Defendant asserts that the trial court improperly limited the scope of his cross-examination of State witnesses. He contends that "[b]y preventing the [Defendant] to meaningfully cross[-examine] all of the [WCSO] detectives, the trial court prevented [the Defendant] from fully developing his theory of the case that the witnesses and the evidence were unreliable due to the negligence and lack of professionalism in conducting the investigation." The State argues that the Defendant has waived plenary review of this issue because he failed to object to the trial court's limitation. Additionally, the State contends that the Defendant should not receive plain error relief because (1) "the record does not clearly establish what additional testimony the [D]efendant sought to elicit from the State's witnesses[;]" (2) "the [D]efendant has failed to establish the breach of a clear and unequivocal rule of law[;]" and (3) "the [D]efendant cannot show that consideration of the alleged error is necessary to do substantial justice." We will first address the State's waiver argument.

After the trial court instructed the jury at the close of jury selection, the following exchange occurred:

> [THE STATE]: Judge, one of the things that exists in this case is that the informant was permitted to drive to and from the drug deals that took place. The informant had a suspended driver's license. The State submits that it is not relevant to any material issue to be determined by this jury.
>
> It's not relevant to credibility in any way, and we would ask that fact be excluded. The status of his license has no bearing whatsoever on whether [the Defendant] did or did not sell cocaine.
>
> [DEFENSE COUNSEL]: Judge, I say that it is proper, and one of the reasons to substantiate the fact that it is proper and material in this case is that it does go to his credibility. And not only to his credibility but it goes to the heart of the defense in this matter. Judge, there was an

agreement that was executed by the informant in this case. It was executed by Jason Lawson, and it was executed by Detective Mike Owen.

And as part of this agreement and as part of the process of this performance of his duties under this agreement, it stated that he was not to participate in any form of illegal activity. That is within the confines of his agreement. And so it would be an argument of the defense during the course of this case that the narcotics officers were overlooking certain things in terms of their dealings with this particular informant. One of the things that they continually would overlook was the fact that they allowed him to commit a criminal offense each and every time they turned him loose and let him out.

They knew . . . from the first point in time that he first went on a run with them through these particular buys that he was operating a motor vehicle on the roadways of Tennessee without a valid driver's license. So it is important for these jurors as they are judging the believability, the credibility, not only of [the CI], the informant of this particular case for the jury to be able to have and understand the true facts as they exist. And so had this b[een] something that the State wanted to raise earlier by way of a written motion and we could have more appropriately responded, I would say to the Court today that should have been done.

It wasn't done. There was a discussion about it this morning, and I told [the State] that not only did I intend to bring it up, I intended to pound on it during the course of my cross-examination of these narcotics officers and then again during the cross-examination of what I believe will be [the CI] testifying. So I understand that the State argues it doesn't go to the heart of the matter as to whether [the Defendant] sold cocaine, but it does go to the heart of the matter of credibility.

[THE STATE]: Rule 609 covers criminal dishonesty, and this is not a crime of dishonesty. It is a misdemeanor offense. This would not be admissible as impeach[ment] material, the fact that he was driving on a suspended license. So it certainly doesn't go to the credibility of the informant, because it does not go to the crime of dishonesty.

As far as the credibility of the officers, I don't see that it goes to the credibility of the officers either. This is not a dishonest act. This does not bear on their character for truthfulness. It was a tactical decision [that] they made.

- 13 -

As far as the agreement goes, the agreement is certainly put into place that if other criminal activity is to become known to them, it gives the State the option to void the agreement. But that is an agreement between the informant and the State. It is not evidence against [the Defendant] here one way or another.

So we simply submit that the fact he was driving on a suspended license meets no definition of a crime of dishonesty. Rule 609 doesn't really mean anybody's credibility.

. . . .

[TRIAL] COURT: It is not a crime of dishonesty that it is a misdemeanor, right?

[DEFENSE COUNSEL]: In and of itself, no.

. . . .

[DEFENSE COUNSEL]: And, Judge, furthermore, on one of these videos that's gonna [sic] be played, he himself is gonna [sic] say [that] he doesn't have a driver's license in the course of the playing of the video.

[TRIAL] COURT: So what you want to do is ask him or ask these officers -- who are you asking? I guess I need to know where we are going with this.

[DEFENSE COUNSEL]: The first officer I understand that is going to be called is Detective McPeak, and Detective McPeak was -- for a lack of a better term -- the case officer of this case. But on two of these he acted like the leader and did work on it. And so I'm gonna [sic] ask him as a part of that process, "When you signed him up, you realized that he did not have a valid driver's license?" "Yes." And then that's it.

I'm gonna [sic] bring that up again, obviously, in my closing argument, but I'm not going to go through the arrests so many times. I want to state, "You knew when you signed him up that he didn't have a license and you worked him without one."

- 14 -

[TRIAL] COURT: That's all you're going to ask him? It won't go any farther than --

[DEFENSE COUNSEL]: I'll ask the same thing of the informant.

[THE STATE]: And I submit that is not relevant. Even to the officer's credibility it is not relevant.

[TRIAL] COURT: I agree with that; I agree with that. That doesn't have anything to do with the officer's credibility, but it is part of the whole story. Whether or not that information is substantially outweighed by the merits, we read this text under rule 403. It doesn't have anything to do with credibility, right?

The State reiterated that the evidence was not relevant to the officers' credibility. The trial court ruled that the CI's driving on a suspended license was "inadmissible to show that the State continued to allow him to violate the law." The trial court also ruled that "clearly this is not a material issue as it relates to credibility." Defense counsel noted that the CI's driving history reflected that his license was revoked for driving under the influence. The trial court said it would reconsider its ruling if defense counsel had proof of the CI's conviction for driving under the influence. The trial court also stated that, if the CI mentioned his lack of a driver's license on the video recordings, then "that would be fair to comment on if it comes out on video."

After a recess for lunch and prior to opening statements, defense counsel noted during a jury-out hearing that "as related to the issue of cross-examination on the driver's license issue, it appears that there is no driving under the influence offense." Defense counsel stated that the CI's driver's license had been suspended over twenty times. The trial court reaffirmed its prior ruling that the CI's driving on a suspended license was inadmissible.

Prior to the testimony of the CI and Chief Deputy Owen, the State noted on the record that, during one of the recordings of the controlled buys, the CI mentioned that his license was suspended. Defense counsel noted that the CI's criminal history showed that he had been convicted of driving under the influence in 2000. The State reasserted its position that the CI's driving on a suspended license was not a crime of dishonesty, was inadmissible for impeachment purposes, and was not relevant. Defense counsel stated the following:

[DEFENSE COUNSEL]: Your Honor, respectfully, I understand that State's position in regard to that, but as part of protocol, the -- when

[Chief Deputy Owen] met with [the CI] originally, from past experience and my own purposes, I feel that [Chief Deputy] Owen is gonna [sic] say he ran a criminal history of [the CI]. And I think I have a right to ask him about that. I'm not gonna [sic] ask him the contents of that criminal history, but -- ["]Did you run a criminal history of him as a part of your initial assessment as to approve him as an informant?["] Because it was [Chief Deputy] Owen that made that approval, and I expect that he will say yes. The reason I expect he will say yes is that the history was provided to me as part of the confidential informant packet in the discovery of this case. Furthermore, I would submit to the [trial] [c]ourt that in every case where an informant is approved or disapproved, there is a running of that informant's driver's license. That is a part of the regular protocol that occurs, and in this particular case, it is factual that the license was suspended or revoked at that time. It will be factual, I submit to the [trial] [c]ourt, that [Chief Deputy] Owen knew that would occur and that he approved the informant otherwise to still be an informant. Now, I don't plan to go any further than that.

The trial court stated that it would reverse its prior ruling and allow defense counsel to cross-examine Chief Deputy Owen regarding whether he or other detectives researched the CI's criminal history prior to using him as a CI. The trial court stated that it would not allow defense counsel to delve into the CI's driving history because it was not relevant. The trial court also found that "the probative value to the defense as far as completeness in this case . . . meets the test of Rule 403."

During cross-examination, Chief Deputy Owen testified that he and other detectives researched the CI's criminal history before agreeing to use him as a CI. He stated that his research showed that the CI did not have a valid driver's license at the time he worked as a CI for the WCSO. The CI testified during cross-examination that, in January and February 2014, he did not have a valid driver's license.

The Defendant contends that "[b]y preventing the [Defendant] to meaningfully cross[-examine] all of the Wilson County Sheriff's detectives, the trial court prevented [the Defendant] from fully developing his theory of the case that the witnesses and the evidence were unreliable due to the negligence and lack of professionalism in conducting the investigation." However, the record reveals that, during the last jury-out hearing on this issue, defense counsel only asked to cross-examine Chief Deputy Owen on whether he or other detectives researched the criminal history of the CI before using him as a CI. The trial court then reversed its prior ruling and allowed defense counsel to do so but instructed defense counsel to not bring up the CI's driving record. The record reflects that defense counsel cross-examined Chief Deputy Owen about his research into the CI's

background and cross-examined the CI about his lack of a valid driver's license. As to the remaining detectives, the Defendant could have informed the trial court that he also wanted to recall the detectives that testified before the trial court's ruling and examine them about whether they investigated the CI's criminal history. However, he did not take this action, and thus, the trial court did not rule on the admissibility of the other detectives' testimony. Therefore, we conclude that this issue is waived. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *State v. Gilley*, 297 S.W.3d 739, 762 (Tenn. Crim. App. 2008) ("The failure to make a contemporaneous objection constitutes waiver of the issue on appeal."). In any event, the Defendant made no offer of proof to establish what the detectives would have testified about if they had been recalled. Thus, even if the trial court erred by limiting the cross-examination, the Defendant has not established that he was prejudiced by the trial court's ruling.

*Sentencing*

### Vagueness of Tennessee Code Annotated section 40-35-115

"Appellate courts are charged with upholding the constitutionality of statutes wherever possible." *State v. Prater*, 137 S.W.3d 25, 31 (Tenn. Crim. App. 2003) (citing *State v. Lyons*, 802 S.W.2d 590, 592 (Tenn. 1990)). Thus, this court is "required to indulge every presumption and resolve every doubt in favor of the constitutionality of the statute when reviewing a statute for a possible constitutional infirmity." *Id.* (citing *Lyons*, 802 S.W.2d at 592). "A statute may be void for vagueness if it is not 'sufficiently precise to put an individual on notice of prohibited activities.'" *State v. Burkhart*, 58 S.W.3d 694, 697 (Tenn. 2001) (quoting *State v. Wilkins*, 655 S.W.2d 914, 915 (Tenn. 1983)). Criminal statutes are construed according to the fair import of their terms. *Id.* "Due process requires that a statute provide 'fair warning' and prohibits holding an individual criminally liable for conduct that a person of common intelligence would not have reasonably understood to be proscribed." *Id.* The constitutional interpretation of a statute is a question of law which we review de novo. *Waters v. Farr*, 291 S.W.3d 873, 882 (Tenn. 2009).

Extensive Criminal History Enhancement Factor

The Defendant asserts that Tennessee Code Annotated section 40-35-115(b)(2) is void for vagueness. He argues that "[t]he term 'extensive' as applied to criminal activity 'invites arbitrary enforcement' and provides no discernable 'fair notice' to defendants." The State contends that, "[w]hen read in conjunction with case law, the contested

- 17 -

statutory provisions provide fair notice and do not lend themselves to arbitrary and discriminatory treatment."

Tennessee Code Annotated section 40-35-115 states that "[t]he court may order sentences to run consecutively if the court finds by a preponderance of the evidence that[] . . . [t]he defendant is an offender whose record of criminal activity is extensive[.]" Tenn. Code Ann. § 40-35-115(b)(2) (2016). This court has previously held that the "extensive criminal history" factor of section 40-35-115(b)(2) is not unconstitutionally vague. *See State v. James C. Carter*, M1998-00798-CCA-R3-CD, 2000 WL 515930, at *13 (Tenn. Crim. App. Apr. 27, 2000), *perm. app. denied* (Tenn. Nov. 20, 2000); *see also State v. Fredrick Sledge*, No. 02C01-9405-CR-00089, 1997 WL 730245, at *32 (Tenn. Crim. App. Nov. 25, 1997), *aff'd as modified and remanded on other grounds by State v. Sledge*, 15 S.W.3d 93 (Tenn. 2000). "The fact that a statute applies in a wide variety of situations and must necessarily use words of general meaning does not render it unconstitutionally vague." *James C. Carter*, 2000 WL 515930, at *13 (citing *Lyons*, 802 S.W.2d at 592). We decline to depart from this court's prior rulings. The Defendant is not entitled to relief on this ground.

Professional Criminal Enhancement Factor

The Defendant also argues that Tennessee Code Annotated section 40-35-115(b)(1) is void for vagueness. He asserts that "[t]here is 'grave uncertainty' about how a judge can determine: 1) if a defendant has in fact knowingly devoted his life to criminal acts, 2) how to measure the 'criminal acts' and 3) how to determine if the criminal acts are a major source of livelihood[,]" citing to the definition of "professional criminal[.]" The Defendant further asserts that "there are no real-world facts or statutory elements for a judge to apply to define a 'professional criminal' that are not arbitrary and provide a defendant with fair notice." As noted above, the State contends that the provision is not unconstitutionally vague.

Tennessee Code Annotated section 40-35-115 states that "[t]he court may order sentences to run consecutively if the court finds by a preponderance of the evidence that[] . . . [t]he defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood[.]" Tenn. Code Ann. § 40-35-115(b)(1) (2016). In *Gray v. State*, our supreme court defined a professional criminal as "one who has knowingly devoted himself to criminal acts as a major source of livelihood or who has substantial income or resources not shown to be derived from a source other than criminal activity[.]" 538 S.W.2d 391, 393 (Tenn. 1976). In *State v. Clifford Leon Farra*, this court noted that "the appellate courts have typically considered the offender's age, criminal history, and constancy of regular employment" in reviewing the application of the professional criminal factor to a determination of consecutive sentencing. No.

E2001-02235-CCA-R3-CD, 2003 WL 22908104, at *14 (Tenn. Crim. App. Dec. 10, 2003) (internal citation omitted), *perm. app. denied* (Tenn. May 10, 2004).

Here, we conclude that the language of the professional criminal factor in section 40-35-115(b)(1) is not unconstitutionally vague. The statute itself provides two definitive aspects of a professional criminal: someone who knowingly devotes their life to criminal acts and whose criminal acts are a major source of their livelihood. Tennessee Code Annotated section 39-11-302(b) states that:

> "[k]nowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

Tenn. Code Ann. § 39-11-302(b) (2016). A person of ordinary intelligence could reasonably interpret "criminal acts" to include criminal conduct or behavior. A person of ordinary intelligence could also reasonably understand "a major source of livelihood" to mean that the criminal acts are a substantial source of the defendant's income, but the criminal acts are not required to be **the major or only source** of income. We conclude that the professional criminal factor of section 40-35-115(b)(1) is sufficiently clear and precise to pass constitutional muster. The Defendant is not entitled to relief on this ground.

### *Abuse of discretion in consecutive sentencing*

The Defendant contends that the trial court erred in ordering his sentence for count three to be served consecutively to his sentences for counts one and two because the total effective sentence is not the least severe measure necessary to achieve the purposes and principles of the Sentencing Act. The State asserts that, "[b]ecause the record supports all three findings, the [D]efendant cannot show that the trial court abused its discretion in imposing consecutive sentencing."

When the record clearly establishes that the trial court imposed a sentence within the appropriate range after a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401 (2016), Sentencing Comm'n Cmts.

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. Tenn. Code Ann. § 40-35-210(e) (2016); *Bise*, 380 S.W.3d at 706. While the trial court should consider enhancement and mitigating factors, such factors are advisory only. *See* Tenn. Code Ann. § 40-35-114 (2016); *see also Bise*, 380 S.W.3d at 699 n.33, 704; *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). A trial court's "misapplication of an enhancement or mitigation factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706.

In *State v. Pollard*, the Tennessee Supreme Court expanded its holding in *Bise* to trial courts' decisions regarding consecutive sentencing. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). A trial court may order a defendant with multiple convictions to serve his or her sentences consecutively if the trial court finds one of the following factors applies by the preponderance of the evidence:

> (1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

> (2) The defendant is an offender whose record of criminal activity is extensive;

> (6) The defendant is sentenced for an offense committed while on probation[.]

Tenn. Code Ann. § 40-35-115(b)(1),(2),(6) (2016). The extensive record of criminal activity factor has been interpreted "to apply to offenders who have an extensive history of criminal convictions and activities, not just to a consideration of the offenses before the sentencing court." *State v. Palmer*, 10 S.W.3d 638, 647-49 (Tenn. Crim. App. 1999). Any one ground set out in the above statute is "a sufficient basis for the imposition of consecutive sentences." *Pollard*, 432 S.W.3d at 862 (citing *State v. Dickson*, 413 S.W.3d 735, 748 (Tenn. 2013)). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Id.* (citing Tenn. R. Crim. P. 32(c)(1)).

The Defendant asserts that his adult criminal history is mostly non-violent, the quantity of cocaine sold in the controlled buys was small, he was not on probation at the time of these offenses, and he had some employment history. The State contends that the trial court properly considered that the Defendant committed the current offenses while on federal supervised probation as a factor for consecutive sentencing. The State notes that the federal judgment refers to the sentence as probation and that this court has

"previously upheld consecutive sentencing where a defendant committed offenses while on supervised release for federal convictions."

In this case, we conclude that the trial court did not abuse its discretion by ordering the Defendant to serve partially consecutive sentences based on its finding that the Defendant was a professional criminal, had an extensive record of criminal activity, and committed the current offenses while on probation. At the sentencing hearing, Ms. Raines testified that Defendant reported that he was self-employed in the concrete industry, but she could not verify this employment. She noted that a previous parole or probation officer had reported that the Defendant had been employed by Sportswear Promotions from May 2, 2005, until June 18, 2005. Ms. Raines also reported that the Defendant had no assets and no debts. Ms. Raines testified that the Defendant had numerous previous convictions: a federal drug offense; four felonies, all of which were drug offenses; six misdemeanors, two of which were drug offenses; a juvenile adjudication of delinquency related to a rape charge; and a pending drug charge. The record reflects that the Defendant has a minimal employment history and numerous drug convictions, which supports the trial court's finding that the Defendant was a professional criminal whose criminal acts were a major source of his livelihood. The Defendant's numerous previous convictions, his pending conviction, his probation violations, and the current charges all support the trial court's finding that the Defendant had an extensive record of criminal behavior. We conclude that the trial court's order of partial consecutive sentencing is warranted based on these two grounds alone. In any event, we will also address the Defendant's contention that trial court erred in finding that he committed the current offenses while on probation.

In *State v. Virgil Campbell*, the trial court ordered consecutive sentencing based on the defendant's extensive record of criminal activity and because the defendant was a dangerous offender. No. E2010-01711-CCA-R3-CD, 2011 WL 2120082, at \*4 (Tenn. Crim. App. May 20, 2011), *no perm. app. filed*. This court conducted a de novo review and concluded that the defendant was sentenced for an offense committed while on probation because "the [d]efendant pleaded guilty to two federal offenses in September 2001 and was on probation for those crimes when the instant aggravated assaults occurred." *Id.*

Here, the Defendant pled guilty to distribution and possession with intent to distribute cocaine base on January 8, 2009, in the United States District Court for the Middle District of Tennessee. The Defendant received a sentence of sixty months to be served concurrently to his unexpired state sentences. The Defendant was placed on "supervised release" for three years. Under the terms of his sentence, the Defendant was required to report to the "probation office" in his district and was assigned to be supervised by a "probation officer." We conclude that the Defendant's alternative

sentence in his federal case is sufficiently similar to state probation.  Thus, it was within the trial court's discretion to consider that the Defendant committed the current offenses while on federal probation in its order of partially consecutive sentences.  The Defendant is not entitled to relief on this ground.

### III. Conclusion

Based on the aforementioned reasons, we affirm the judgments of the trial court.


_____
ROBERT L. HOLLOWAY, JR., JUDGE